[No. 31114. Department Two. February 10, 1950.]

JOHN A. MCKENNA et al., Respondents, v. SEATTLE-FIRST NATIONAL BANK et al., Respondents, MARGARET WATSON, et al., Appellants.

SEATTLE-FIRST NATIONAL BANK, as Trustee, Respondent, v. JOHN A. MCKENNA et al., Respondents, MARGARET WATSON et al., Appellants.[1]

[1]Reported in 214 P. (2d) 664.

*Emory, Howe, Davis & Riese* (*John M. Harding,* of counsel) and *Clarke, Stone & Hoover,* for appellants.

*Hyland, Elvidge & Alvord, Monroe Watt, John Veblen, Albert D. Rosellini,* and *J. Will Jones,* for respondents.

ROBINSON, J.—This is an appeal from a decree entered after trial, in the superior court of King county, of two actions which were consolidated for trial because they grew out of the same facts and presented essentially the same questions of law. One of the actions was instituted by the Seattle-First National Bank for the purpose of obtaining a declaration as to the person or persons to whom it should convey certain real property held by it in trust. The other action was brought by one John A. McKenna, and certain others, claiming title to the real property in question, plaintiffs praying that their title be quieted as against the bank and as against certain other persons claiming interests in the property as heirs of the settlor of the trust. The trial court entered a decree quieting title in favor of McKenna and the other parties plaintiff in the second action. This appeal has been taken by the heirs of the settlor. Although the trustee bank is named as one of the respondents, we

shall, for convenience, use that term to designate only McKenna and those claiming under him.

The appeal presents no issues of fact, since the facts are stipulated. The background of the consolidated cases may be epitomized as follows:

On June 9, 1921, or thereabouts, a cause of action in tort for damages arose in favor of respondent John A. McKenna, and against Hugh L. Watson, now deceased. July 18, 1921, or thereabouts, Hugh L. Watson delivered the sum of six thousand three hundred dollars to the predecessor of respondent Seattle-First National Bank, with written instructions to the bank to purchase certain real property and to hold it in trust for the benefit of the settlor's grandmother, Helen Langston, and mother, Nellie C. Watson, for their respective lives, and for the life of the survivor of them. Pursuant to these instructions, the bank purchased the property in question and executed a declaration of trust, in terms substantially identical to·those of the trust instructions. This document read, in part, as follows:

"2. The said Helen Langston and Nellie C. Watson during their lifetimes, and during the lifetime of the survivor of them, have the right to occupy and use said property as a home for the two of them jointly so long as they both live, and as a home for the survivor of them until the death of such survivor, irrevocable by any act of said trustee or of the said Hugh L. Watson or by any act of them the said trustee and the said Hugh L. Watson.

"3. Upon the death of the survivor of the said Helen Langston and said Nellie C. Watson said property shall be by said trustee conveyed to the said Hugh L. Watson in case he shall then be alive; or in case he shall have died prior to the death of the survivor of them as aforesaid, then in such case said property shall be conveyed by the trustee to the legal heirs of the said Hugh L. Watson."

This case turns entirely upon the interpretation to be given paragraph No. 3.

December 30, 1921, a default judgment was entered in favor of respondent McKenna and against Hugh Watson, the settlor, in connection with the tort cause of action. April 26, 1924, execution having been issued upon the judgment,

the interest of Hugh Watson in the real property held in trust was sold at sheriff's sale and conveyed to respondent McKenna by sheriff's deed. Such interest as respondent McKenna acquired by the sheriff's deed was held by respondents McKenna, Gilbert, Tucker, Hyland, and Elvidge at the time of trial.

In 1935, the settlor, Hugh Watson, died; in 1937, Helen Langston, one of the two life tenants, died; and in 1947, Nellie C. Watson, the second of the two life tenants, died. The sole heirs at law of the settlor, Hugh Watson, were appellants, Margaret Watson, his widow, and Nellie C. Watson, his mother. Appellant Cecil Langston is the brother of Nellie C. Watson and her sole heir at law.

Appellants contend that this trust instrument created concurrent contingent remainders in Hugh Watson, as settlor, and in his "legal heirs." Their argument, as we understand it, is as follows: Hugh Watson's interest, being entirely contingent upon his surviving the life tenants, terminated with his death. Upon this event, the contingent remainder in the heirs became a vested remainder in Margaret Watson, his widow, and Nellie C. Watson, his mother, these being his heirs as determined at the date of his death. Nellie C. Watson, of course, was also life tenant of the property by virtue of the terms of the declaration of trust. Upon her death, her share of the remainder interest descended to Cecil Langston, her brother, and the remainder became possessory in him and in Margaret Watson, the surviving widow. Appellants argue that respondents, whose claim is based solely upon their status as successors in interest to Hugh Watson, can now make no claim to the property, the only contingency upon which it was limited to return to the settlor having failed to occur.

■ Putting aside, for the moment, the question of whether the heirs held a valid contingent remainder, we may note that in no event could Hugh Watson's interest be so described. The trustee bank took only such an interest as would enable it to carry out the objects and purposes of the trust. The trust itself was to expire with the death

of the life tenants, *Hobbie v. Ogden,* 178 Ill. 357, 53 N. E. 104, and the provision directing the bank to convey the trust property upon that event was superfluous, *Doctor v. Hughes,* 225 N. Y. 305, 122 N. E. 221, since it would have been required to do so in any case. *Livingston v. Ward,* 247 N. Y. 97, 159 N. E. 875. The bank, therefore, took an interest which could endure for a term no greater than that embraced by the life estates. "The result is, therefore, the same as it would have been if the estate of the trustees had only been an estate *pour autre vie,* . . . " *Ellis v. Page,* 61 Mass. (7 Cush.) 161. See *In re Kenyon,* 17 R. I. 149, 158, 20 Atl. 294. Consequently, the settlor, Hugh Watson, retained a reversion (1 Simes, Law of Future Interests, p. 67, § 46); for, when an owner in fee simple transfers a life estate, even if it is to be followed by a contingent remainder in fee, the transferor, having disposed of less than his entire interest, has a reversion by operation of law. Burby on Real Property, p. 459, § 287; *Clark v. Hillis,* 134 Ind. 421, 34 N. E. 13. The nature of this estate cannot be changed by calling it a remainder. *Robinson v. Blankenship,* 116 Tenn. 394, 92 S. W. 854. As is said in the last cited case:

"So that if after the creation of this life estate . . ., he [the grantor] had simply reserved a remainder to himself without more, the law fixing the character of the estate which remained in him as a reversion, would have let him into the possession upon the determination of the estate granted as a reversion, rather than as remainderman."

It is true that the limitation to Hugh Watson was conditional in form, providing that the property "shall be by said trustee conveyed to the said Hugh L. Watson *in case* he shall then be alive; or in case he shall have died . . . to the legal heirs of the said Hugh L. Watson." But since Hugh Watson already possessed the estate in reversion, from which he had never been parted, and since it is axiomatic that all reversions are vested estates (Gray, The Rule Against Perpetuities (4th ed.), p. 102, § 113), this limitation cannot be said to have imposed a condition precedent to the vesting of his interest. If it had any effect, it imposed a

condition subsequent, which might operate to divest that interest. Thus, Gray states (p. 105, § 113.2):

"When an estate is given on a condition, the condition is always both precedent and subsequent; it is precedent as to the estate which is given on the condition, it is subsequent as to the estate which now exists and will continue to exist if the condition is not fulfilled. The vesting of an estate is not affected by the fact that it may be divested by a condition subsequent."

Appellants' claim, therefore, must rest on the argument that, even though Hugh Watson's estate was vested, it was subject to be divested by his decease prior to the termination of the life estates; that, by this instrument, Hugh Watson intended to create life estates in his mother and grandmother, and to create a remainder in fee in his heirs, contingent on his predeceasing the life tenant; and that, as the contingency happened, the remainder vested. *Wells v. Kuhn* (Mo.), 221 S. W. 19. Had the ultimate remainder been to specifically named persons, rather than to heirs, this view would doubtless be correct (Limitation to the Heirs of a Settlor, 34 Ill. L. Rev. 835, 843), and the death of Hugh Watson, occurring during the period of the continuance of the life estates, would have operated to divest his reversion and vest a remainder in those persons. Appellants urge that, even if we consider that Hugh Watson retained a reversion, this is precisely what happened here.

Respondents do not appear to contend, on this appeal, that the transfer of the purchase money for the property from the settlor to the trustee bank amounted to a fraudulent conveyance, and they agree that the trust instruments created valid life interests in the real property in the two life tenants and the survivor of them. They contend, however, that the limitation to heirs was null and void, and that it had no other effect than to confirm the reversion in Hugh Watson. They argue that this reversion passed to respondent McKenna by virtue of the sheriff's deed, and, the life estates having terminated, that they, as McKenna's successors, are now entitled to the property.

Respondents base their contention upon a very old and well-established principle of property law, which is sometimes referred to as the doctrine of worthier title, and sometimes—perhaps more accurately—as the *inter vivos* branch of the doctrine of worthier title, but which is perhaps best designated as the rule against a remainder to the grantor's heirs. (A case drawing a distinction between the "doctrine of worthier title" in its technical or orthodox sense and the rule with which we are here concerned, is *Mitchell v. Dauphin Deposit Trust Co.*, 283 Ky. 532, 142 S. W. (2d) 181. Compare Professors Harper and Heckel, The Doctrine of Worthier Title, 24 Ill. L. Rev., with Morris, The Inter Vivos Branch of the Doctrine of Worthier Title, 2 Okla. L. Rev. 133; and note Professor Warren's somewhat polemical article, A Remainder to the Grantor's Heirs, 22 Tex. L. Rev. 22.)

The rule has been defined in 125 A. L. R. 548, at p. 551, as

". . . the doctrine that an inter vivos conveyance for life, with attempted remainder to the heirs or next of kin of the conveyor, is ineffective to create a remainder, but leaves a reversion in the conveyor."

Like the rule in Shelley's case, to which it is related (*National Shawmut Bank of Boston v. Joy*, 315 Mass. 457, 53 N. E. (2d) 113; "Remainders" to Conveyors' Heirs or Next of Kin, 44 Dickinson L. Rev. 247) and with which it has often been confused (*Doctor v. Hughes*, 225 N. Y. 305, 122 N. E. 221), the rule against a remainder to the grantor's heirs had its origin in the feudal system, in the principle that "a man cannot raise a fee-simple to his own right heirs by the name of heirs, as a purchase, neither by conveyance of land, nor by use, nor by devise." *Counden v. Clerke*, 80 Eng. Reprint (Hob. 30) 180. *Godolphin v. Abingdon*, 2 Atkyns 57, 26 Eng. Reprint 432.

It is now generally conceded that whatever may have been the original reasons for its adoption, they have long since disappeared. *In re Burchell's Estate*, 299 N. Y. 351, 87 N. E. (2d) 293; 1 Simes, Law of Future Interests, p. 265,

§ 147; "Limitations to Settlors' Heirs," 37 Cal. L. Rev. 283. Nevertheless, the rule has been adopted in nearly all of the American jurisdictions which have had occasion to consider it. See annotation at 125 A. L. R. 541, and, in addition to the cases there cited, *Beach v. Busey,* 156 F. (2d) 496 (1946); *Wilson v. Pharris,* 203 Ark. 614, 158 S. W. (2d) 274 (1941); *Bixby v. California Trust Co.,* 33 Cal. (2d) 495, 202 P. (2d) 1018 (1949); *May v. Marx,* 300 Ill. App. 144, 20 N. E. (2d) 821 (leave to appeal denied, 300 Ill. App. xiii) (1939); *Corwin v. Rheims,* 390 Ill. 205, 61 N. E. (2d) 40 (1945); *Pewitt v. Workman,* 289 Ky. 459, 159 S. W. (2d) 21 (1942); *National Shawmut Bank of Boston v. Joy,* 315 Mass. 457, 53 N. E. (2d) 113 (1944); *Davidson v. Davidson,* 350 Mo. 639, 167 S. W. (2d) 641 (1943); *Fidelity Union Trust Co. v. Parfner,* 135 N. J. Eq. 133, 37 A. (2d) 675 (1944); *Richardson v. Richardson,* 298 N. Y. 135, 81 N. E. (2d) 54. The strictness with which it is applied varies greatly among the different jurisdictions, however, one extreme being represented by Pennsylvania, which holds the rule one of property, to be applied, presumably, regardless of intent (*In re Brolasky's Estate,* 302 Pa. 439, 153 Atl. 739); the other being represented by New York, which holds:

"But this rule . . . is with us no more than a *prima facie* precept of construction which may serve to point the intent of the author, when the interpretation of a writing like this trust agreement is not otherwise plain. Inasmuch as for us that rule has now no other effect, it must give place to a sufficient expression by a grantor of his purpose to make a gift of a remainder to those who will be his distributees." *Engel v. Guaranty Trust Co.,* 280 N. Y. 43, 19 N. E. (2d) 673.

See, also, *In re Burchell's Estate,* 299 N. Y. 351, 87 N. E. (2d) 293 (1949).

Probably, none of the courts applying the rule, however, would dissent from the proposition that it should be followed, at least in cases where

" . . . there is nothing which shows an intent . . . to create remainder interests in his heirs at law or to justify

a departure from the usual rule of construction." *Bixby v. California Trust Co.,* 33 Cal. (2d) 495, 202 P. (2d) 1018.

The New York approach, as well as the general concept of the rule as one of construction, developed from the leading case of *Doctor v. Hughes,* 225 N. Y. 305, 122 N. E. 221. In that case, realty was conveyed to a trustee, who, upon the death of the grantor, was to convey to the heirs of the latter. While the grantor was still living, one of his daughters conveyed to her husband all her interest in the realty. The plaintiffs, judgment creditors of the husband, sought to subject his interest to their lien. It was held that the interest of the husband was a mere expectancy and not subject to execution, the grantor having reserved a reversion in the property rather than having created a remainder in his heirs. In the course of the opinion, however, Judge Cardozo, after observing that, at common law, the direction to transfer the estate to the heirs of the grantor would "indubitably have been equivalent to the reservation of a reversion," stated:

"But in the absence of modifying statute, the rule persists to-day, at least as a rule of construction, if not as one of property. . . . We do not say that the ancient rule survives as an absolute prohibition limiting the power of a grantor. . . . There may be times . . . when a reference to the heirs of the grantor will be regarded as the gift of a remainder, and will vest title in the heirs presumptive as upon a gift to the heirs of others . . . Even at common law, a distinction was taken between grants to the heirs as such, and grants where the reference to heirs was a mere *descriptio personarum* . . . But at least the ancient rule survives to this extent, that to transform into a remainder what would ordinarily be a reversion, the intention to work the transformation must be clearly expressed. Here there is no clear expression of such a purpose."

In a later paragraph, the opinion suggests an explanation for the remarkable vitality of the rule:

"There is no adequate disclosure of a purpose in the mind of this grantor to vest his presumptive heirs with rights which it would be beyond his power to defeat. No one is

heir to the living; and seldom do the living mean to forego the power of disposition during life by the direction that upon death there shall be a transfer to their heirs."

This assumption does not seem unwarranted. Vague end limitations to "heirs" or "heirs at law" or "next of kin" are frequent in *inter vivos* conveyances, as where a grantor conveys property in trust, either for his own benefit (the *Doctor* case) or for the benefit of another (the present case), for the life of the beneficiary, providing that, upon the death of the latter, the trust corpus should "revert" or "descend" or "be conveyed" to his heirs. If these limitations are treated as remainders, the effect will be to create interests in favor of the heirs (a class of persons which cannot be ascertained until the grantor's death) which may not be destroyed by the grantor. Even with the consent of the life beneficiary, he may not revoke the trust which, though it contain an express provision that it should be irrevocable, he would otherwise (ordinarily) be able to do. Restatement, Trusts, p. 1033, § 338 (1), comment (a). Should he obtain the consent of the heirs presumptive to the revocation, it has been held that even that might be insufficient (*Engel v. Guaranty Trust Co.,* 280 N. Y. 43, 19 N. E. (2d) 673); and it would unquestionably be insufficient if the heirs presumptive were minors or for some other reason incapable of consent (*Whittemore v. Equitable Trust Co.,* 250 N. Y. 298, 165 N. E. 454).

Furthermore, the grantor would be unable to convey or devise an interest in the property remaining after the life estate, for the very reason that he would have already granted the whole of such interest; and this would be so, even though his conveyees or devisees were friends of long standing, while his heirs at law presumptive, entitled to the property by virtue of the end limitation considered as a remainder, were distant relatives. See *National Shawmut Bank of Boston v. Joy,* 315 Mass. 457, 53 N. E. (2d) 113.

It seems more probable that the average grantor, in making a limitation to heirs in a conveyance of this kind, is merely providing for what should be done in the event

that he is no longer living and capable of taking the property himself at the termination of the trust estate; and that he actually has no thought of creating an indestructible interest in his as yet undetermined heirs. This is the view of the Restatement of Property, which would accept the rule against a remainder to the grantor's heirs "unless a contrary intent is found from additional language or circumstances" (Restatement, Property, p. 1776, § 314 (1)), and, in explanation, states:

"The continuance of the rule stated in Subsection (1) as a rule of construction is justified on the basis that it represents the probable intention of the average conveyor. Where a person makes a gift in remainder to his own heirs (particularly where he also gives himself an estate for life) he seldom intends to create an indestructible interest in those persons who take his property by intestacy, but intends the same thing as if he had given the remainder 'to my estate'." Restatement, Property, p. 1778, § 314, comment (a).

See, also, *Fidelity Union Trust Co. v. Parfner,* 135 N. J. Eq. 133, 37 A. (2d) 675.

It is, of course, true that, if a grantor has his children in mind, when he creates an end limitation to "heirs," he may well intend to create an indestructible interest in them. But, as is suggested in the preceding quotation from *Doctor v. Hughes,* it was held, even at common law, that, where it could be gathered from the whole of the instrument that the grantor intended "heirs" to refer to children, or to any other specified group save his heirs at law, the rule would not apply. In such cases, courts have generally not hesitated to find a remainder in the children. *Boone v. Baird,* 91 Miss. 420, 44 So. 929; *Shirey v. Clark,* 72 Ark. 539, 81 S. W. 1057; *Huss v. Stephens,* 51 Pa. 282.

Appellants argue that at least the rule should not be regarded as a rigid mandate of law, to be applied in every case without consideration of the probable intent of the grantor; and with this position we are inclined to agree. There may well be occasions when a grantor, by the use of an end limitation to heirs, intends to express his desire

that indestructible interests should be created in those individuals who will turn out to be his heirs upon his death. If this is his purpose, there would seem to be no reason in modern times why it should not be effectuated. The fact that this purpose may exist in but a minority of cases presents a convincing argument against the desirability of wholly abandoning the rule; but, if its chief contemporary justification lies in the circumstance that it serves to implement probable intention, it would be anomalous to invoke it in cases where its effect would be to defeat the grantor's plain design.

That the rule should not be treated as one of law has been the view of almost all of the commentators on the subject, both of those who have favored its continuance as a rule of construction (Professor Edward H. Warren, A Remainder to the Grantor's Heirs, 22 Tex. L. Rev. 22; Limitations to Settlors' Heirs, 37 Cal. L. Rev. 283; J. Wesley Oler, "Remainders" to Conveyors' Heirs or Next of Kin, 44 Dickinson L. Rev. 247 (by the author of the extensive comment on the rule at 125 A. L. R. 548); Professor Russell R. Reno, The Doctrine of Worthier Title as Applied in Maryland, 4 Md. L. Rev. 50; Joseph W. Morris, The Inter Vivos Branch of the Worthier Title Doctrine, 2 Okla. L. Rev. 133; Joseph W. Morris, *Bixby v. California Trust Co.*, An Answer, 24 Cal. State Bar Jour. 324; The Worthier Title Doctrine in California, 1 Stanford L. Rev. 774); and, needless to say, of those who have urged its complete abolition (Limitations to Heirs of the Grantor, 39 Col. L. Rev. 628, at p. 656; Inter Vivos Trusts and the Doctrine of Worthier Title, 48 Yale L. Jour. 874; Walter L. Nossaman, Gifts to Heirs, Remainder or Reversion, 24 Cal. State Bar Jour. 59 and 329; Limitation to the Heirs of a Settlor, 34 Ill. L. Rev. 835). Professor Simes, who does not favor the rule (Simes, Fifty Years of Future Interests, 50 Harv. L. Rev. 749, 756), nevertheless states that its invocation as a matter of construction "would seem to be the only reasonable basis for its application today." 1 Simes, Law of Future Interests, p. 265, § 147.

Even if regarded as a rule of construction, the rule against a remainder to the grantor's heirs is subject to the uncertainties of any rule based on intent, and its application may, in peculiar circumstances, bring about unfortunate or inequitable results. (See comment on *City Bank Farmers Trust Co. v. Miller*, 278 N. Y. 134, 15 N. E. (2d) 553, in·48 Yale L. Jour. 874.) But an examination of the cases invoking the rule, as cited earlier in this opinion, does not indicate that this is the usual consequence. Rather, it shows that the rule has, on the whole, proved a useful device to aid courts in ascertaining the probable intent of the grantor where his actual intent is not clear.

We, therefore, have no hesitation in holding that, in an *inter vivos* conveyance, where nothing in the instrument discloses a contrary intent, a remainder limited to the grantor's heirs will be regarded as the equivalent of. a reservation of a reversion in the grantor himself. ♦ ♦ ♦

Appellants place much reliance on *Norman v. Horton*, 344 Mo. 290, 126 S. W. (2d) 187, 125 A. L. R. 531. In that case, the court held that an ultimate limitation to the heirs at law of a grantor resulted in a remainder rather than a reversion, on the ground that this interpretation was in accord with the grantor's intention. In the course of reaching this result, the court seems to have abandoned entirely the rule against a remainder to the grantor's heirs, although this "ancient rule of feudal tenure," as it was termed, had apparently been previously applied in the Missouri cases of *Wells v. Kuhn* (Mo.), 221 S. W. 19, and *Stephens v. Moore*, 298 Mo. 215, 249 S. W. 601, neither of which the court mentioned. However, in the later case of *Davidson v. Davidson*, 350 Mo. 639, 167 S. W. (2d) 641, the author of the opinion in the *Norman* case specifically adopted the rule as set forth in the Restatement and quoted extensively therefrom. A ·reversion was found, and the *Norman* case distinguished, on ·the ground that the instrument being construed in the *Davidson* case lacked several features present in the instrument involved in the *Norman* case, which, the court felt, had been inescapably indicative of intent to create a

remainder. Without discussing these features at length, we may note that they are lacking in the case at bar as well, and we cannot, for that reason, regard the *Norman* case as authoritative, except in so far as it emphasizes the importance of attempting to carry out the grantor's intent in cases of this kind.

Appellants also rely on *Whittemore v. Equitable Trust Co.*, 250 N. Y. 298, 165 N. E. 454, one of numerous New York cases which, though adhering to the rule against a remainder to the grantor's heirs as a rule of construction, have nevertheless held, in particular instances, that such remainders had been created; and they contend that the indicia of intent which influenced the court to reach this result in the *Whittemore* and similar cases, are present in the case at bar, and, providing we follow the rule as one of construction, require us to reach the same result here.

In the *Whittemore* case, three settlors placed property in trust for two named beneficiaries for life. Upon their death, the trust estate was to be returned to the settlors in equal shares, but, if any of them was then dead, his or her share was to be paid to his appointee by will. In default of appointment, it was to be paid to such persons as would take in the event the deceased settlor died intestate. Section 23 of the New York Personal Property Law permits the settlor to revoke a trust of personalty with the consent of all persons beneficially interested. All of the adult parties to this trust desired its revocation, but the trustee resisted their efforts to bring it about, on the ground that the children of the settlors, as heirs presumptive, had a beneficial interest in the trust, and, being minors, could not consent to revocation. The court agreed, holding that the intent of the settlors, as construed from the instrument, had been to create a remainder, and that the children were, therefore, beneficially interested parties whose consent would be required in order for the trust to be revoked.

The same court, in construing the decision in the later case of *Engel v. Guaranty Trust Co.*, 280 N. Y. 43, 19 N. E. (2d) 673, said:

"The chief reason for that view was the circumstance that the only provision which the settlors made for control by them of the trust principal gave them no power save that of testamentary disposition thereof. (Id. [250 N. Y. 298] 301, 303.)"

In other words, the court was of the opinion that the reservation of the power of appointment indicated that the settlors believed that their ultimate limitation had created an interest in the heirs, and that they reserved the power in order to be able to defeat that interest. Under this theory, had they intended to retain a reversion, the power would have been superfluous, since, in that circumstance, the settlors could have transferred their interest, not only by will, but by *inter vivos* conveyance, without any provision in the trust instrument permitting them to do so. *Richardson v. Richardson*, 298 N. Y. 135, 81 N. E. (2d) 54, and 39 Col. L. Rev. 628, 665, cited therein; *In re Burchell's Estate*, 299 N. Y. 351, 87 N. E. (2d) 293. Or, as respondents have succinctly put the matter in their brief:

"The settlor was to have the right to dispose of the property only by will. The retention of the power of testamentary disposition was emphasized by the court as a factor in showing intention to create a remainder by purchase in the next of kin. If the settlor were to have a reversion of all remaining after the life estates, the express reservation of the power of disposition would be meaningless. The express provision for only one of the powers that would belong to the settlor if there were a reversion gives rise to the inference that the power reserved is the only right reserved, thus negativing the usual presumption in favor of a reversion in the settlor."

Other courts, even in New York, have not invariably taken this view of the effect of the reservation of a power of appointment, and have found reversions even where such reservations were present. *Fidelity & Columbia Trust Co. v. Williams*, 268 Ky. 671, 105 S. W. (2d) 814; *Sinnott v. City Bank Farmers Trust Co.*, 71 N. Y. S. (2d) 514; *Davies v. City Bank Farmers Trust Co.*, 248 App. Div. 380, 288 N. Y. S. 398. See *Fidelity Union Trust Co. v. Parfner*, 135 N. J. Eq. 133, 37 A. (2d) 675, and cases there cited. Indeed it has

specifically been held that such a reservation aids the presumption that a reversion was intended. *Green v. City Bank Farmers Trust Co.,* 72 N. Y. S. (2d) 442. In *Stephens v. Moore,* 298 Mo. 215, 249 S. W. 601, the court said:

"The words, 'and the trust shall pass to and vest in my legal heirs, or as may be directed in my will,' is a mere statement, by way of further limitation of the trustee's estate, that the grantor reserves full authority to dispose of the reversion as he sees fit."

But, in any event, such a power was not involved in the case here under consideration, and we need not concern ourselves with this aspect of the problem more than to note that the circumstance of the reservation of the power of appointment by will, in an instrument which made full and formal disposition of the trust property, and yet contained no provision reserving a corresponding power to grant or assign an interest in the property during the life of the settlor, seems to have been the principal factor in causing the New York court to find an intention to create a remainder, not only in the *Whittemore, Engel,* and *Richardson* cases, *supra,* but in *Hussey v. City Bank Farmers' Trust Co.,* 236 App. Div. 117, 258 N. Y. S. 396, affirmed 261 N. Y. 533, 185 N. E. 726. It is quite plain, from the following language in the *Whittemore* case, that had the instrument there under consideration been of the type with which we are here concerned, the court would have found, not a remainder, but a reversion:

"If the trust deed had said that upon the death of the life beneficiary the net principal of the trust estate was to be paid over and delivered to the settlor or his next of kin in equal shares, the addition in this place of the words 'next of kin,' would not have been sufficient in all probability to create a remainder. Rather it would indicate that the settlor intended all above a life interest to remain with him as a reversion to be disposed of in any way he pleased. The words would indicate a limitation, not a gift. (*Whittemore v. Equitable Trust Co.,* 162 App. Div. 607; *Doctor v. Hughes,* 225 N. Y. 305.) But that is not this case."

This language was quoted with approval in the *Richardson* case, which, except for *In re Burchell's Estate,* 299 N. Y.

351, 87 N. E. (2d) 293, is the latest decision of the New York Court of Appeals on this subject.

Close scrutiny of the instruments in the case at bar reveals nothing which would tend to indicate that it was the intention of this settlor to create remainder interests in favor of those who might, in the event of his decease before the expiration of the trust period, become entitled to benefits thereunder. The main purpose of the entire transaction appears to have been the acquisition of the property and the protection of the settlor's mother and grandmother in their occupancy thereof. That purpose being accomplished, it seems reasonable to suppose that the settlor intended that the property should return to him, and naturally, in the event he were no longer living, to any who might inherit from him. The fact that he specified that the property should pass to him, if he survived the life tenants, would seem, if anything, to strengthen the presumption that he reserved a reversion. The courts have generally taken this view when construing instruments containing similar provisions. *Wells v. Kuhn* (Mo.), 221 S. W. 19; *Wilcoxen v. Owen,* 237 Ala. 169, 185 So. 897, 125 A. L. R. 539; *Due v. Woodward,* 151 Ala. 136, 44 So. 44; *Berlenbach v. Chemical Bank & Trust Co.,* 235 App. Div. 170, 256 N. Y. S. 563; *Genesee Valley Trust Co. v. Newborn,* 168 Misc. 703, 6 N. Y. S. (2d) 498.

In *Green v. City Bank Farmers Trust Co.,* 72 N. Y. S. (2d) 442, four settlors had established a trust for their own benefit, scheduled to terminate at the end of a specified period when the property was to revert to the settlors. In the event of a settlor's death prior to the expiration of the trust, the principal was to pass to those whom he might appoint by will, and, in default of such appointment, to his intestate distributees. Particularly in view of the fact that the trust in the present case was set up for the benefit of the settlor's mother and grandmother, whom he might normally be expected to outlive, the following language from the *Green* case seems appropriate in this connection:

"In seeking to determine the settlor's intent herein, major significance must manifestly be given to the fact that the trust is not to run for the life of the settlor, but is to terminate upon the happening of an independent event, whereupon the principal of the trust is to revert to the settlor and the trust is to terminate. The provisions for payment of income and principal, in the event of testator's intestacy, from which respondent trustee would spell out an intention on the part of the settlor to create a remainder, is itself wholly contingent upon the settlor's decease before the expiration of the trust period. Such expiration, during the life of the settlor, would completely cut off even the expectancy of those whom the trustee characterizes as remaindermen."

See dicta to similar effect in *Engel v. Guaranty Trust Co.,* 280 N. Y. 43, 19 N. E. (2d) 673, and *Richardson v. Richardson,* 298 N. Y. 135, 81 N. E. (2d) 54.

■ As we are unable to find anything in the circumstances of this case which would warrant us in disregarding the usual common-law rule, we hold that the settlor, in establishing the trust under consideration, created neither concurrent contingent remainders in himself and his heirs, nor a single contingent remainder in his heirs, which would vest in the event of his decease prior to the termination of the life estates; but that, on the contrary, he did nothing more than reserve to himself an indefeasible reversion, which was reached by execution and passed to respondent McKenna by virtue of the sheriff's deed. The life estates having terminated, respondents McKenna, Gilbert, Tucker, Hyland, and Elvidge, are now entitled to a fee simple estate in the property.

The decree is affirmed.

MALLERY, HILL, and HAMLEY, JJ., concur.

SIMPSON, C. J., concurs in the result.