Anna P. HATCH, Appellant,

v.

The RIGGS NATIONAL BANK et al., Appellees.

No. 19707.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 12, 1966.

Decided May 20, 1966.

7. Cf. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 597, 68 S.Ct. 715, 92 L.Ed. 898 (1948).

Mr. Marion Edwyn Harrison, Washington, D. C., for appellant.

Mr. Frederick M. Bradley, Washington, D. C., for appellee Riggs Nat. Bank. Mr. James E. Murray, Washington, D. C., also entered an appearance for appellee Riggs Nat. Bank.

Mr. Thomas A. Flannery, Washington, D. C., guardian ad litem, for appellee Francesca Hall.

Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge.

Appellant seeks in this action to obtain modification of a trust she created in 1923. The income terms of the trust instrument are of a spendthrift character, directing the trustees to pay to the settlor for life all the income from the trust estate "for her own use and benefit, without the power to her to anticipate, alienate or charge the same * * *." Upon the death of the settlor-life tenant, the trustees are to pay over the corpus as the settlor may appoint by will; if she fails to exercise this testamentary power of appointment, the corpus is to go to "such of her next of kin * * * as by the law in force in the District of Columbia at the death of the * * * [settlor] shall be provided for in the distribution of an intestate's personal property therein." No power to appoint the corpus by deed, nor any power to revoke, alter, amend or modify the trust, was expressly retained by appellant, and the instrument states that she conveys the property to the trustees "irrevocably."

Appellant does not claim that the declaration of trust itself authorizes her to revoke or modify the trust. In effect she invokes the doctrine of worthier title, which teaches that a grant of trust corpus to the heirs of the settlor creates a reversion in the settlor rather than a remainder in his heirs. She claims that since she is the sole beneficiary of the trust under this doctrine, and is also the settlor, she may revoke or modify under accepted principles of trust law.

The District Court, while sympathizing with appellant's desire to obtain an additional stipend of $5000 a year, out of corpus, "to accommodate recently incurred expenses, and to live more nearly in accordance with her refined but yet modest tastes,"[1] felt that denial of the requested relief was required by this court's decision in Liberty National Bank v. Hicks, 84 U.S.App.D.C. 198, 173 F.2d 631, 9 A.L.R.2d 1355 (1948). Summary judgment was granted for appellees. We affirm.

## I

The *Hicks* case involved a spendthrift trust created by Hicks in which all income was reserved to the settlor for life; at his death, half of the corpus was to go, by detailed provisions not relevant here, to his children or their issue, and the other half according to his will or, lacking a will, to his heirs at law according to the statutes of descent of the District of Columbia. The trust, by the terms of the trust agreement, was irrevocable. Hicks subsequently executed an instrument revoking the trust and demanded that the trustees turn over the corpus to him. The bank refused, and Hicks brought an action to have the trust declared void as a spendthrift trust against public policy. The court, noting that any rules against spendthrift provisions were for the protection of creditors, held that the settlor could not invoke the invalidity of his own trust to revoke it. It further held that revocation was not effected because, with request to both halves of the trust, Hicks had not obtained the

consent of all beneficiaries.[2] With respect to the second half of Hicks' trust, analogous to the one set up by appellant in the case at bar, the court stated (84 U.S.App.D.C. at 202, 173 F.2d at 635):

> * * * Hicks reserved no right of disposition except by last will, in the absence of (failing) which it is to pass to his heirs-at-law. This provision of the trust shows, we think, that as to it Hicks intended to and did reserve only the right to dispose of it by testamentary appointment. This right continues, but, except as it provides, Hicks in creating this trust retained no control or estate, save his life interest in the income. His present effort, contrary to the terms of the trust, to alter and amend its limitations, must, therefore, be held for naught. This is the rule applied by the Maryland Court of Appeals in Allen v. Safe Deposit & Trust Co., 177 Md. 26, 7 A.2d 180, which we adopt and approve.

In neither the *Hicks* case nor the *Allen* case which it followed did the court address itself to the doctrine of worthier title. The abbreviated discussion in *Hicks* may be taken as an implied rejection of that doctrine, though it was not discussed, for if the doctrine of worthier title were applicable, then the gift over to heirs-at-law would not be effective to create a remainder interest making their consent, as beneficiaries, a condition to revocation of the trust. This appeal squarely raises the question, and we deem it appropriate that we rely not on the aura of *Hicks,* but on an express considera-

---

1. In her complaint, appellant also sought an additional $50,000 from corpus to purchase a residence, but dropped this request at the hearing. The District Court found that there was "no suggestion of extravagance" in appellant's way of life or in her request for additional funds. She now lives in a one-bedroom apartment in a modest residential section of Long Beach, California, and has no assets except limited jewelry, furniture, personal effects, and a medium-priced automobile.

2. "[A] trust once validly constituted may not thereafter be terminated without the consent of all the cestuis que trust. This includes not only those specially named but those then unborn who may take on the expiration of the trust according to the terms." 84 U.S.App.D.C. at 201, 173 F.2d at 634. The court relied on an earlier opinion to the same effect in Hurt v. Gilmer, 59 App.D.C. 282, 40 F.2d 794 (1930).

tion of the applicability of the doctrine of worthier title.

The doctrine of worthier title had its origins in the feudal system which to a large extent molded the English common law which we inherited. In its common law form, the doctrine provided that a conveyance of land by a grantor with a limitation over to his own heirs resulted in a reversion in the grantor rather than creating a remainder interest in the heirs. It was a rule of law distinct from, though motivated largely by the same policies as, the Rule in Shelley's Case. Apparently the feudal overlord was entitled to certain valuable incidents when property held by one of his feoffees passed by "descent" to an heir rather than by "purchase" to a tranferee. The doctrine of worthier title—whereby descent is deemed "worthier" than purchase—remained ensconced in English law, notwithstanding the passing of the feudal system, until abrogated by statute in 1833.[3]

The doctrine has survived in many American jurisdictions, with respect to inter vivos conveyances of both land and personalty, as a common law "rule of construction" rather than a "rule of law." In Doctor v. Hughes, 225 N.Y. 305, 122 N.E. 221 (1919), Judge Cardozo's landmark opinion reviewed the common-law history of the doctrine and concluded that its modern relevance was as a rule of construction, a rebuttable presumption that the grantor's likely intent, in referring to his own heirs, was to reserve a reversion in his estate rather than create a remainder interest in the heirs. Evidence might be introduced to show that the grantor really

meant what he said when he spoke of creating a remainder in his heirs. "Even at common law," wrote Cardozo, "a distinction was taken between grants to the heirs as such, and grants where the reference to heirs was a mere *descriptio personarum*." But to overcome the presumption that a reversion rather than a remainder was intended, "the intention to work the transformation must be clearly expressed." 122 N.E. at 222.

In the decades that followed, the worthier title doctrine as a rule of construction with respect to inter vivos transfers won widespread acceptance.[4] The "modern" rationale for the rule is well stated in an opinion of the Supreme Court of California:

It is said that where a person creates a life estate in himself with a gift over to his heirs he ordinarily intends the same thing as if he had given the property to his estate; that he does not intend to make a gift to any particular person but indicates only that upon his death the residue of the trust property shall be distributed according to the general laws governing succession; and that he does not intend to create in any persons an interest which would prevent him from exercising control over the beneficial interest. * * * Moreover, this rule of construction is in accord with the general policy in favor of the free alienability of property, since its operation tends to make property more readily transferable.[5]

While the weight of authority, as just indicated, supports the retention of the doctrine of worthier title (unlike its common-law brother, the Rule in Shelley's

---

3. 3 & 4 Wm. IV, ch. 106, § 3. For more detailed discussion of the evolution of the doctrine of worthier title at common law, see Annot., 125 A.L.R. 548, 549–550 (1940); Doctor v. Hughes, 225 N.Y. 305, 122 N.E. 221 (1919); In re Burchell's Estate, 299 N.Y. 351, 87 N.E.2d 293, 296 (1949).

4. See RESTATEMENT, PROPERTY, § 314(1) (1940); RESTATEMENT (SECOND),

TRUSTS, § 127 Comment b (1959); Annot., 16 A.L.R.2d 691 (1951).

5. Bixby v. California Trust Co., 33 Cal.2d 495, 202 P.2d 1018, 1019 (1949). See also McKenna v. Seattle-First Nat. Bank, 35 Wash.2d 662, 214 P.2d 664, 16 A.L.R. 2d 679 (1950).

Case) as a rule of construction, there has been substantial and increasing opposition to the doctrine.[6]

The views of the critics of the doctrine, which we find persuasive against its adoption, and borne out by the experience of the New York courts in the series of cases which have followed Doctor v. Hughes, *supra*, may be summarized as follows. The common-law reasons for the doctrine are as obsolete as those behind the Rule in Shelley's Case.[7] Retention of the doctrine as a rule of construction is pernicious in several respects.

First, it is questionable whether it accords with the intent of the average settlor. It is perhaps tempting to say that the settlor intended to create no beneficial interest in his heirs when he said "to myself for life, remainder to my heirs" when the question is revocation of the trust, or whether creditors of the settlor's heirs should be able to reach their interest. But the same result is far from appealing if the settlor-life beneficiary dies without revoking the trust and leaves a will which makes no provision for his heirs-at-law (whom he supposed to be taken care of by the trust). In short, while the dominant intent of most such trusts may well be to benefit the life tenant during his life, a subsidiary but nevertheless significant purpose of many such trusts may be to satisfy a natural desire to benefit one's heirs or next of kin. In the normal case an adult has a pretty good idea who his heirs will be at death, and probably means exactly what he says when he states in the trust instrument, "remainder to my heirs."

It is said that the cases in which such is the grantor's intent can be discerned by an examination into his intent; the presumption that a gift over to one's heirs creates a reversion can thereby be rebutted in appropriate cases. But the only repository of the settlor's intent, in most cases, will be the trust instrument itself. Nor would it be fruitful or conducive to orderly and prompt resolution of litigation to engage in searches for other sources of intent. In the typical case of this genre—a stark, unqualified "to myself for life, remainder to my heirs"—the instrument will send forth no signals of contrary intent to overcome the presumption that only a reversion was intended. Yet this is precisely the class of cases in which settlors are likely to have intended to create beneficial interests in their heirs.

A lengthier document may send forth more signals, but they may well be murky. Where other indicia of intent can be discovered in the trust instrument, with the aid of ingenious counsel, the result, as the New York cases have demonstrated, is a shower of strained decisions difficult to reconcile with one another and generative of considerable confusion in the law.[8] After three decades of observing the New York courts administer the rule of construction announced in Doctor v. Hughes, *supra*, Professor Powell of Columbia observed that "there were literally scores of cases, many of which reached the Appellate Division, and no case involving a substantial sum could be fairly regarded as closed until its language and circumstances had been passed upon by the Court of Appeals * * *. This state of uncertainty was

6. See. e. g., Simes, *Fifty Years of Future Interests*, 50 Harv.L.Rev. 749, 756 (1937); Note, 48 Yale L.J. 874 (1939); Note, 39 Colum.L.Rev. 628, 656 (1939); Comment, 34 Ill.L.Rev. 835, 850–51 (1940). A recent study of the subject by Professor Verrall of the University of California, under the auspices of the California Law Revision Commission, resulted in a strong condemnation of the doctrine. Verrall, *The Doctrine of Worthier Title:*
*A Questionable Rule of Construction*, 6 U.C.L.A.L.Rev. 371 (1959).

7. The Rule in Shelley's Case (1 Coke Rep. 104) has been abolished by statute in the District of Columbia. D.C.Code § 45–203 (1961 ed.).

8. The New York cases are admirably summarized and discussed in Verrall, *op. cit. supra* note 6, at 374–387.

the product of changing an inflexible rule of law into a rule of construction." [9]

An excellent example of this confusion is the effect to be given the fact that, as in the case at bar, the settlor has reserved the power to defeat the heirs' interest by appointing the taker of the remainder by will. One might well think that the reservation of a power of appointment was an index of intent which buttressed the presumption of a reversion by demonstrating that the settlor did not wish to create firm interests or expectations among his heirs, but intended to retain control over the property. Most courts, including the New York Court of Appeals in its most recent pronouncement on the subject, have disagreed, albeit over the voice of dissent.[10] They have reasoned that the retention of the testamentary power of appointment confirms the intent to create a remainder in the heirs, since the settlor would not have retained the power had he not thought he was creating a remainder interest in the heirs.

We see no reason to plunge the District of Columbia into the ranks of those jurisdictions bogged in the morass of exploring, under the modern doctrine of worthier title, "the almost ephemeral qualities which go to prove the necessary intent." [11] The alleged benefit of effectuating intent must be balanced against the resulting volume of litigation and the diversity and difficulty of decision.[12] We are not persuaded that the policy of upholding the intention of creators of trusts is best effectuated by such a rule of construction, with its accompanying uncertainty.

The rule we adopt, which treats the settlor's heirs like any other remaindermen, although possibly defeating the intention of some settlors, is overall, we think, an intent-effectuating rule. It contributes to certainty of written expression and conceptual integrity in the law of trusts. It allows heirs to take as remaindermen when so named, and promises less litigation, greater predictability, and easier drafting. These considerations are no small element of justice.

We hold, then, that the doctrine of worthier title is no part of the law of trusts in the District of Columbia, either as a rule of law or as a rule of construction. Any act or words of the settlor of a trust which would validly create a remainder interest in a named third party may create a valid remainder interest in the settlor's heirs. It follows that the District Court was correct in granting summary judgment for appellees in this case, since appellant's action is based on the theory that she was the sole beneficiary and hence could revoke the "irrevocable" trust she had created.

## II

Appellant's invocation of worthier title was premised in part on the injustice alleged to result in many cases from holding such a trust irrevocable. The irrevocability was supposed to be riveted into the trust by the impossibility of obtaining consent to revocation from all the beneficiaries, since some of them are still unborn. Appellant's argument reflects a misunderstanding of the consequence of the judgment of the District Court.

██ It is hornbook law that any trust, no matter how "irrevocable" by its terms, may be revoked with the consent of the settlor and all beneficiaries.[13]

██ The beneficiaries of the trust created by appellant are herself, as life tenant, and her heirs, as remaindermen. Her heirs, if determined as of the present

9. POWELL, CASES ON FUTURE INTERESTS 88 n. 14 (3d ed. 1961).

10. In re Burchell's Estate, 299 N.Y. 351, 361, 87 N.E.2d 293, 297 (1949); see Comment, 34 ILL.L.REV. 834, 844–45 (1940).

11. In re Burchell's Estate, supra, 299 N.Y. at 361, 87 N.E.2d at 297 (1949).

12. These results led Judge Fuld to call for "clarifying legislation." Dissent in In re Burchell's Estate, supra note 10.

13. RESTATEMENT (SECOND), TRUSTS § 338 (1) (1959); SCOTT, TRUSTS § 338 (2d ed. 1956).

time, are her two sisters. There is no assurance that they will in fact be the heirs who take the remainder under the trust; appellant might survive one or both. Yet their consent is necessary, we think, to revocation, since they are at least the persons who would be beneficiaries if the settlor died today.[14]

In addition, it is necessary to protect the interests of those additional persons, both living and unborn, who may, depending on circumstances, be members of the class of heirs at the time the corpus is distributed. We think that upon an adequate showing, by the party petitioning to revoke or modify the trust, that those who are, so to speak, the heirs as of the present time consent to the modification, and that there is a reasonable possibility that the modification that has been proposed adequately protects the interests of those other persons who might be heirs at the time the corpus is to be distributed, the District Court may appoint a guardian ad litem to represent the interests of those additional persons.

■ Although the question has not been previously discussed by this court we think basic principles of trust law are in accord with appointment of a guardian ad litem to represent interests of unborn or unascertained beneficiaries, for purposes of consent to modification or revocation of a trust. This use of a guardian ad litem is not uncommon in other jurisdictions. In a number of states authority for such appointments is provided by statute.[15] These statutes reflect a broad sentiment of the approaches that are consistent with the Anglo-American system of law and adopted to promote the objective of justice. Where it is at least debatable whether rulings must await express legislative authorization, this court must take into account the fact that the legislature for the District of Columbia is primarily concerned with awesome questions of national policy, and we should be more ready to accept our obligation as a court to refine and adapt the corpus of law without waiting for a legislative go-ahead. Here we are certainly in a field where it is not inappropriate for courts to act without statutory foundation, as appears from the well-considered authority cited in the margin.[16] "Courts of justice as an incident of their jurisdiction have inherent power to appoint guardians ad litem."[17] The ef-

---

14. One of the sisters is not *sui juris.* In referring to her consent, we do not mean to exclude consent by her guardian ad litem.

15. E. g., CAL.CODE CIV.PROC. § 373.5; ILL.REV.STAT. ch. 22, § 6 (1959); RESTATEMENT, PROPERTY § 182, Comment e (1936). The leading case upholding such appointments is Gunnell v. Palmer, 370 Ill. 206, 18 N.E.2d 202, 120 A.L.R. 871 (1938), noted in 34 ILL.L.REV. 101 (1939), where the court viewed the statute as providing the same protections to unborn persons as traditional doctrines of equitable representation. See also Wogman v. Wells Fargo Bank & Union Trust Co., 123 Cal.App.2d 657, 267 P.2d 423, 429 (1954); Reynolds v. Remick, 327 Mass. 465, 99 N.E.2d 279 (1951). Compare Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 317–318, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

16. Peoples Nat. Bank v. Barlow, 235 S.C. 488, 112 S.E.2d 396, 398–399 (1960). A few courts have held, to the contrary, that no guardian ad litem for the interests of unborn beneficiaries may be appointed in the absence of express statutory authorization. E. g., Moxley v. Title Ins. & Trust Co., 154 P.2d 417 (Cal.Dist.Ct. App.1945), decided before the California statute, *supra* note 15, was passed. That decision, it should be noted, was affirmed by the California Supreme Court, 27 Cal. 2d 457, 165 P.2d 15, 163 A.L.R. 838 (1946), with no discussion of this point; Justice Traynor, dissenting, relied on an earlier California holding that appointment of a guardian ad litem for unborn beneficiaries was proper. 165 P.2d at 26. The *Restatement* expressly takes no position as to whether the general power of equity, apart from statute, includes the power to appoint such a guardian. RESTATEMENT, PROPERTY, § 182, Comment e (1936).

17. Mabry v. Scott, 51 Cal.App.2d 245, 124 P.2d 659, 665, cert. denied sub nom. Title Ins. & Trust Co. v. Mabry, 317 U.S. 670, 63 S.Ct. 75, 87 L.Ed. 538 (1942). See also Smith v. Lamb, 103 Ga.App. 157, 118 S.E.2d 924, 927 (1961) (power to

ficacy of a guardian ad litem appointed to protect the interests of unborn persons is no different whether he be appointed pursuant to statute or the court's inherent power. Given such protection, the equitable doctrine of representation embraces the flexibility, born of convenience and necessity, to act upon the interests of unborn contingent remaindermen to the same effect as if they had been *sui juris* and parties.[18]

The use of guardians ad litem to represent interests of unborn and/or otherwise unascertainable beneficiaries of a trust seems to us wholly appropriate. Though the persons whose interests the guardian ad litem represents would be unascertainable as individuals, they are identifiable as a class and their interest, as such, recognizable.

The settlor seeking to revoke or modify the trust may supplement his appeal to equity with a quid pro quo offered to the heirs for their consent. In many cases it may well be consistent with or even in furtherance of the interest of the heirs to grant such consent. The case at bar provides a good example. Here the interest of all heirs is contingent, since appellant can defeat their remainder by exercising her testamentary power of appointment. If the modification agreed upon not only increased the annual income of the life tenant but also transferred assets in trust for the benefit of the heirs, without any power of alteration in the settlor, the heirs' remainder interest would be secure, and accordingly more valuable than it is now. The pattern of such a modification is clearly available where the remaindermen of a trust are specific named persons, and, we think, should also be available where the remaindermen are recognizable as a class even though the members of the class are not now individually ascertainable.

Appellant, proceeding on a different theory, has not taken steps to obtain the consent of heirs. We think it important to make clear that, in rejecting the doctrine of worthier title, we do not mean to put settlors and life tenants of trusts in which the remaindermen are the settlor's heirs at an unwarranted disadvantage with respect to legitimate efforts to modify trust arrangements concluded largely for their own benefit. Our affirmance of the judgment for appellees is without prejudice to a future submission by appellant on such a basis.

Affirmed.

---

appoint guardian ad litem an "incident of courts"); 27 AM.JUR., *Infants* § 120, pp. 840–41 ("The power to appoint a guardian ad litem is inherent in every court of justice."). Compare Rule 17(c), FED.R.CIV.P.

18. Peoples Nat. Bank v. Barlow, *supra* note 16.