**UNITED STATES of America, Plaintiff,**

v.

**Wanda Lee RITTER, as Administratrix, Estate of Don McClintock Ritter, Jr., Deceased, et al., Defendants.**

**Civ. A. No. 74–58–HN.**

United States District Court,
S. D. West Virginia,
Huntington Division.

March 25, 1976.

John A. Field, III, U.S. Atty., S. D. of W. Va., Charleston, W. Va., William R. Morrow, Jr. and Joseph M. Persinger, U.S. Dept. of Justice, Tax Div., Washington, D. C., for plaintiff.

Robert H. Burford and Charles E. Heilmann, Beckett, Burford & James, Huntington, W. Va., for Wanda Lee Ritter, et al.

Noel P. Copen, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W. Va., for First Huntington National Bank.

## OPINION

### DENNIS R. KNAPP, Chief Judge.

The Government instituted this action on May 2, 1974, praying for a judgment against defendant Wanda Lee Ritter, as administratrix of the estate of Don McClintock Ritter, Jr.,[1] in the amount of $69,-777.80, which sum represents tax assessments[2] made against the administratrix and foreclosure of the government's tax lien against the interest of the taxpayer in certain trust assets.[3] Jurisdiction of the Court is based on 26 U.S.C. §§ 7401–7403 and 28 U.S.C. §§ 1340, 1345.

Taxpayer, a resident of Broward County, Florida, died intestate on October 29, 1966, survived by his wife and four children. For the years 1961 through 1965, taxpayer failed to file income tax returns and to pay any income taxes. After the appointment of Wanda Lee Ritter as the administratrix of the taxpayer's estate, the Internal Revenue Service filed proofs of claims in the Broward County Judge's Court for the delinquent taxes, to which no objections were made by the estate.

Subsequent to the filing of this action, the United States District Court for the Southern District of Florida entered judgment in favor of the government and against the administratrix on the tax assessments, that issue having been contemporaneously litigated in the Southern District of Florida and in this Court.[4] Thus, the sole question to be resolved on the cross motions of the parties for summary judgment is whether the government is entitled to foreclose on the federal tax liens.

By will dated July 3, 1942, C. Lloyd Ritter created a testamentary trust whereby he bequeathed to defendants William R. Ritter and The First Huntington National Bank, as trustees, that part of his estate remaining after the debts of the testator had been paid and certain personal property bequeathed.

---

1. Wanda Lee Ritter, administratrix, etc., will be referred to as "administratrix." Her decedent Don McClintock Ritter, Jr. will be referred to as "taxpayer."

2. INTERNAL REVENUE CODE OF 1954 (26 U.S.C.):
   SEC. 6321. Lien for taxes
   If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

SEC. 6322 [As amended by Sec. 113, Fed.Tax Lien Act of 1966, P.L. 89–719, 80 Stat. 1125.]
   Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment) is satisfied or becomes unenforceable by reason of lapse of time.

3. Defendants William John Ritter, Deborah Kay Ritter, Charles Lloyd Ritter, III and Mark Ritter, are the children of Wanda Lee Ritter and taxpayer.

4. *U. S. v. Wanda Lee Ritter, Administratrix, etc.,* Case No. FL–74–134–CIV–NCR (S.D.Fla.).

The trust created was to continue until the death of Mabel McClintock Ritter, wife of the testator. During her lifetime, the trustees were directed to pay from the trust:

"Three-tenths ($\frac{3}{10}$s) of the net income to my wife, Mabel McClintock Ritter;

"Two-tenths ($\frac{2}{10}$s) of the net income to my son, Lloyd Ritter, Jr.;

"Two-tenths ($\frac{2}{10}$s) of the net income to my son, William R. Ritter;

"Two-tenths ($\frac{2}{10}$s) of the net income to my son, Donald Ritter, Sr.;

"One-tenth ($\frac{1}{10}$) of the net income to my grandson, Donnie Ritter, Jr. [taxpayer]."

Upon the death of Mabel Ritter, the trust was to terminate. The trustees were then directed to pay over to each of the testator's three sons three-tenths "of the corpus of the trust in fee and in kind." With respect to taxpayer, the trustees were directed to pay over to him:

" . . . [a] one-tenth ($\frac{1}{10}$) of the corpus of the trust in fee and in kind, to be paid over to him not earlier than his twenty-first birthday, and upon that event and thereafter at such time or times as my said trustees may in their discretion think wise, determining such payments by said grandson's ability to control, possess and wisely administer his portion of the trust estate. In the interim, my said grandson shall be paid all the net income earned from any portion of the trust estate not then delivered to him in fee. If upon the death of my said wife, my said grandson shall not be living or he shall die before he shall have received all of his portion of the trust estate, any part or balance that shall not have been delivered to him shall be paid over to his issue per stirpes, if any him survive, and if he leave no issue, then that portion of the trust estate he was to have received shall be paid over equally to my three said sons and/or the issue per stirpes of any that may at that time not be living."

Some six years prior to the August 13, 1961 death of Mabel Ritter, the testator's three sons and taxpayer, the named beneficiaries in the testamentary trust, along with the trustees thereof, entered into a "Trust Agreement" dated July 6, 1955.[5]

The purpose of this agreement was

"to continue and extend in effect the trust so created by C. Lloyd Ritter for a period of twenty (20) years from the date of the termination of said trust by the death of Mabel McClintock Ritter, with such modifications of the terms as are specified [therein] . . . ."

Under the provisions of the July 6, 1955 agreement, the named beneficiaries transferred to the trustees their respective interest in the corpus of the testamentary trust to which each was entitled upon the death of Mabel Ritter.

The agreement further provided that the trustees were to hold this property for a term of twenty years after the death of Mabel Ritter. During this twenty-year period, the trustees were to distribute three-tenths of the income of the corpus of this extended trust to each of the testator's three sons and one-tenth of the income to taxpayer.

The agreement further provided:

"2. . . . upon the expiration of said twenty year period and the termination of this extension trust agreement the corpus of said trust estate shall be transferred and distributed to said four beneficiaries [the three sons and taxpayer] in the same proportion as said income is distributable, and in the event of the death of any beneficiary during the period of said twenty years, the income and corpus which would have been distributed to such deceased beneficiary shall be distributed *as and when it is due under this agreement* to Those who shall be entitled to receive it according to the terms and provisions of the last will and testament of said deceased beneficiary or otherwise

5. Mildred S. Ritter, wife of William R. Ritter, was a party to the trust agreement solely for the purpose of releasing her dower interest in the assets of the trust. See W.Va.Code 43–1–1.

according to the laws of descent and distribution of the State of West Virginia. (Emphasis supplied).

"4. That this agreement shall remain in full force and effect for the period of twenty years from and after the death of the said Mabel McClintock Ritter, and in the event any one or more of the said Lloyd Ritter, Jr., William R. Ritter, Don McClintock Ritter, Sr., and Don McClintock Ritter, Jr., shall die before the commencement of the twenty year period of this extension, that is, before the death of Mabel McClintock Ritter, this agreement shall remain effective as to all other interests in said original trust estate property, and shall be binding upon all the heirs, devisees, distributees, executors, administrators or assigns of all the parties to this agreement who shall survive the said Mabel McClintock Ritter, provided, however, that at any time during said twenty years trust period of this agreement this extended trust may be cancelled and terminated by the unanimous written consent of all those of the said Lloyd Ritter, Jr., William R. Ritter, Don McClintock Ritter, Sr., and Don McClintock Ritter, Jr., who shall then be living."

An amendment to the trust indenture, of even date therewith, provided, in part:

" . . . it is agreed between the parties hereto that any beneficiary under said trust may assign his interest in the corpus of the trust property of said trust to the said First Huntington National Bank [the corporate trustee], for the payment of any indebtedness heretofore or hereafter *incurred by a beneficiary with said Bank, and that said indebtedness shall be paid from any such beneficiary's share at the beginning of said twenty year period.* PROVIDED, however, that each other beneficiary shall be entitled to receive as a withdrawal from the corpus of said trust an amount which shall be according to such beneficiary's proportionate interest in the trust estate for the payment of any said indebtedness to the

First Huntington National Bank so that the beneficiaries of the said trust estate shall thereafter have the same proportionate interest in the income therefrom as is provided under said Will, and Agreement of July 6, 1955, and PROVIDED, further that without the written consent of all the parties hereto the amount of such indebtedness of any beneficiary shall not exceed $25,000 as to any beneficiary owning a $\frac{3}{10}$'s interest or such proportion of said amount as to the owner of a lesser amount [the taxpayer] in the corpus of the trust estate." (Emphasis supplied).

The legal issue dispositive of the question presented is whether, by the terms of the July 6, 1955 trust agreement, as amended, a reversion of the trust estate remained in the settlors [6] or whether the settlors created a remainder in such estate. It is conceded by both sides that if a reversion is found to exist, then taxpayer's interest would be part of his estate, thereby subjecting such interest to the reach of the government as a judgment creditor. W.Va. Code 36–1–9. It is further conceded, however, that if a remainder were created, none of the assets consisting of taxpayer's share of the trust assets would fall back into his estate but rather would pass to the remaindermen.

By reason of *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this Court is obliged to apply West Virginia law in deciding this issue. Unfortunately, there is very little to be found under the West Virginia statutes and case law that aids this Court in disposing of the issue involved.

Both sides agree that the issue has not yet been decided by the Supreme Court of Appeals of West Virginia. Therefore it is this Court's duty to make an "informed prediction of what [this] state's highest court would decide if the [instant] case were before it." *Maynard v. General Electric Co.,* 350 F.Supp. 949 (S.D.W.Va.1972), aff'd 486 F.2d 538 (4th Cir. 1973).

---

6.  I. e., Lloyd Ritter, Jr., William R. Ritter, Donald Ritter, Sr., and taxpayer.

■ The doctrine of worthier title[7] teaches that a grant of trust corpus to the heirs of the settlor—or equivalent words—creates a reversion in the settlor rather than a remainder in his heirs.[8] *Hatch v. Riggs National Bank,* 124 U.S.App.D.C. 105, 361 F.2d 559 (1966). *Simes on Future Interests* (1951), § 25, pp. 83–94.

> "The doctrine had its origina in the feudal custom of awarding certain valuable incidents to the overlord upon the descent of property held by a people. These incidents did not accrue if the property was acquired through purchase, and, in order to obviate this means of curtailing the payment of incidents, title by descent was declared to be more worthy than title by purchase." *In re Burchell's Estate,* 299 N.Y. 351, 358, 87 N.E.2d 293, 296 (1949)

From what was once undoubtedly a rule of law, the doctrine has now become one of construction in the majority of jurisdictions. *Doctor v. Hughes,* 225 N.Y. 305, 122 N.E. 221 (1919); *Whittemore v. Equitable Trust Co.,* 250 N.Y. 298, 165 N.E. 454 (1929); *Braswell v. Braswell,* 195 W.Va. 971, 81 S.E.2d 560 (1954); 16 A.L.R.2d 679.

While there are no West Virginia decisions discussing this doctrine, one writer suggests that it might very well be a rule of law in West Virginia. Note 63 W.Va.L. Rev. 143, 191 (1961). However, that writer does indeed recognize that the "[c]ontemporary decisions in other jurisdictions have come to accept the Doctrine of Worthier Title as only a rule of construction." Id. at p. 151.

■ But, in either event, this rule has no application in the instant case. "The rule does not apply if the limitation is construed to mean that the property was intended to pass to the heirs of the grantor or upon an equivalent limitation, determined at some time other than the death of the grantor." *Braswell v. Braswell,* supra, at 81 S.E.2d 563 (Emphasis supplied). See also *Allison v. Allison's Ex'rs,* 101 Va. 537, 44 S.E. 904 (1903); *Simes on Future Interests,* 526, p. 86 (1951); 63 W.Va.L.Rev., supra, at p. 144.

In addition, "[w]here there is a gift over to the persons who may be heirs or next of kin of the settlor, not at the time of the settlor's death *but at the time of distribution*" a remainder is created. *II Scott on Trusts § 127.1.* (Emphasis supplied).

Here, the trust agreement states that in the event of the death of a conveyor, his share would not be distributed until "it is due under this agreement"—that is, at the end of the 20-year period. The person or persons entitled to the share of the deceased conveyor under the descent and distribution statutes[9] could only be determined at that time.

The government's position is that the record in this case does not reveal any intent on the part of the settlors of the extended trust to create a remainder. Conversely, the administratrix contends that the pertinent instruments do indeed show sufficient intent to create a remainder. In other words, both sides to this action are saying that if the doctrine is to be applied, it should be regarded as a rule of construction rather than a rule of law.

■ From an extensive review of a large volume of authorities, this Court is of the firm conviction that the West Virginia Su-

---

7. The provisions of W.Va.Code 36–1–14a abolish the doctrine of worthier title. However, that section only applies to instruments which became effective after May 15, 1969.

8. "A reversion is the remnant of an estate continuing in the grantor, undisposed of, after the grant of a part of his interest. It differs from a remainder in that it arises by act of the law, whereas a remainder is by act of the parties. A reversion, moreover, is the remnant left in the grantor, whilst a remainder is the remnant of the whole estate disposed of, after a preceding part of the same has been given away." 1 *Minor on Real Property* (2nd Edition) § 769, p. 1005.

9. Assuming taxpayer's widow and/or children are living at the end of the twenty-year period, the West Virginia "descent" statute provides that the children of the decedent would be entitled to all real estate of the decedent subject to the dower interest of the widow. W.Va. Code 42–1–1. The "distribution" statute provides that the widow is entitled to one-third of the personal estate and the surviving children two-thirds thereof. W.Va.Code 42–2–1.

preme Court of Appeals would regard the doctrine as being a rule of construction. *Doctor v. Hughes,* supra; *Braswell v. Braswell,* supra.

Assuming then that the doctrine applies at all under the facts of this case and that it would apply as a rule of construction, the question remains whether the instruments create a remainder.

In *Doctor v. Hughes,* supra, Judge Cardozo wrote, at 122 N.E. 222:

"But at least the ancient rule services to the extent: That, to transform into a remainder what would ordinarily be a reversion, the intention to work the transformation must be clearly expressed."

Ten years later in *Whittemore v. Equitable Trust Co.,* supra, the New York court (which included Judge Cardozo) limited the "clear expression" test in holding at 165 N.E. at page 456:

"This is all a matter of intention. The creator of a trust can do as he pleases with his property and the courts look to his words to guide them in decisions. The directions come from the owner of the property, and not from the law, unless there be some specific statute to be enforced. To determine, therefore, whether the settlor of the trust in this case simply created a life interest and nothing more, reserving to himself the balance of the interest in the property, *we looked to his intention, as expressed in the trust instrument."* (Emphasis supplied).

Where the settlor reserves a power to appoint the remainder by testamentary disposition and in default thereof the property shall be conveyed to his heirs or next of kin, "it is more arguable that he intends to create an interest in such persons. . . ." *II Scott on Trusts,* supra, at p. 992. Numerous courts have held that when such or similar provisions are present, the heirs take as purchasers. Id. at p. 993, note 13.

In *In re Burchell's Estate,* supra, the settlor established a trust whereby she was to receive the income for her life and upon her death the principal was to go to the persons named in her will, or failing such testamentary disposition, to such persons as would be entitled if she had died intestate. It was held that a remainder was created.

In discussing this case, the court in *Hatch v. Riggs,* supra, stated at p. 564:

"They [the Burchell court] have reasoned that the intention of the testamentary power of appointment confirms the intent to create a remainder in the heirs, since the settlor would not have retained the power had he not thought he was creating a remainder interest in his heirs."

The government relies mainly on the case of *Berlenbach v. Chemical Bank and Trust Co.,* 256 N.Y.Supp. 563, aff'd 260 N.Y. 539, 184 N.E. 83 (1932). In that case, a deed of trust directed the trustee to pay the net income from the property to the grantor during his life but not exceeding twenty years, and to then pay the principal to the grantor, if living, or if he should die during such period, to pay the principal to his testamentary appointees, residuary legatees, or persons entitled to his personalty in case of intestacy. The Court held "[i]n making himself the sole beneficiary for 20 years, and providing that then the estate return to him, if he be then living, *and not giving the trustee full control over the investment of the fund,* it is obvious that he erected this trust for his own benefit." (Emphasis supplied).

*Berlenbach* was decided some seventeen years prior to the New York court's holding in *In re Burchell's Estate,* supra, respecting the retention of the testamentary power of appointment as being sufficient to show the intent to create a remainder. Moreover, in *Berlenbach* the trustee was without power to change the investments without the grantor's consent. In the instant case the trustees were given full and sole control over the corpus of the trust with full power to sell, convey, invest, reinvest, etc.[10]

10. The powers of the trustees are set forth in the Ritter will and incorporated by reference into the trust agreement by paragraph 3 thereof.

■ The government contends that the settlors had an absolute right to assign all, or at least part, of their share of the corpus and that fact is evidence that they did not intend to create a remainder but rather erected this trust for their own benefit.

The amendment to the trust indenture provided in part:

" . . . it is agreed between the parties hereto that any beneficiary under said trust may assign his interest in the corpus of the trust property of said trust to the said First Huntington National Bank [the corporate trustee], for the payment of any indebtedness heretofore or hereafter incurred by a beneficiary with said Bank, and that said indebtedness shall be paid from any such beneficiary's share at the beginning of said twenty year period. . . ."

The Court is of the opinion that this provision is far from being an unlimited reservation to assign to creditors. Rather, the provision only provides that each settlor could assign a portion of his respective share only to the First Huntington National Bank and that assignment could only be made "at the beginning of the twenty-year term." It does not authorize any assignment to the bank—or anyone else—after the twenty-year period commences.

■ The government also takes the position that the lack of intent of the settlors to create a remainder is further evidenced by the fact that the settlors expressly reserved in the agreement an expressed power of revocation. This power of revocation is found in paragraph 4 of the agreement which provides:

"4. That this agreement shall remain in full force and effect for the period of twenty years from and after the death of the said Mabel McClintock Ritter, and in the event any one or more of the said Lloyd Ritter, Jr., William R. Ritter, Don McClintock Ritter, Sr., and Don McClintock Ritter, Jr., shall die before the commencement of the twenty year period of this extension, that is, before the death of Mabel McClintock Ritter, this agreement shall remain effective as to all the other interests in said original trust estate property, and shall be binding upon all the heirs, devisees, distributees, executors, administrators or assigns of all the parties to this agreement who shall survive the said Mabel McClintock Ritter, provided, however, that at any time during said twenty year trust period of this agreement this extended trust may be cancelled and terminated by the unanimous written consent of all those of the said Lloyd Ritter, Jr., William R. Ritter, Don McClintock Ritter, Sr., and Don McClintock Ritter, Jr., who shall then be living."

Thus, the settlors reserved the right to revoke the extended trust, providing that all the settlors agreed to do so. Contrary to this power being indicative of a lack of intent to create a remainder, it is indeed evidence of the intent to create a remainder.

■ It is the law of West Virginia that a settlor of a trust may not revoke the trust without the consent of other beneficiaries of the trust, unless in the instrument creating the trust he reserved the power of revocation. *Grand Lodge of Ind. Order of Odd Fellows v. Gunnoe*, 154 W.Va. 594, 177 S.E.2d 159 (1970). In other words, if there are no other beneficiaries to a trust (other than the settlors themselves), a reserved power of revocation is not necessary. If there are other beneficiaries, the settlors must reserve that power. Here, the power was expressly reserved. Therefore, the settlors must have believed that other beneficiaries (remaindermen) were created. Otherwise, the act of expressly reserving the power to revoke was a useless act.

■ In view of the foregoing, it is the prediction of this Court that the West Virginia Supreme Court of Appeals would hold that the provisions of the trust agreement, as amended, created a remainder in the trust estate. Therefore, judgment will be for the defendants.