Herbert Cecil VENCILL, Juanita Sue Ellison and Melva S. Workman, Plaintiffs,

v.

CONTINENTAL CASUALTY COMPANY, a corporation, Defendant and Cross-Claimant.

INSURANCE COMPANY OF NORTH AMERICA, a corporation, Defendant and Third-Party Plaintiff,

v.

George F. JAMES, Third-Party Defendant.

Civ. A. No. 73–41–BL.

United States District Court, S. D. West Virginia, Bluefield Division.

June 20, 1977.

Harold D. Brewster, Jr., Sidney J. Kwass, Bluefield, W. Va., for plaintiffs.

Robert M. Richardson, Charles W. Davies, Bluefield, W. Va., for Insurance Company of North America; Edward W. Eardley, Charleston, W. Va., for Continental Casualty Company; Jerry J. Cameron, and Kenneth E. Trabue, Roanoke, Va., for George F. James.

## MEMORANDUM OPINION

DENNIS R. KNAPP, Chief Judge.

### FINDINGS OF FACT

In March, 1971, Herbert Vencill was notified by Employers of Wausau Insurance Company (hereinafter referred to as "Employers") that it would not renew the liability insurance contract it had with Vencill covering a fleet of vehicles used in connection with Vencill's contract carrier business in Virginia. Employers agent, Paul Cochran, told Vencill, however, that he would

assist Vencill in obtaining new coverage. Cochran contacted George F. James, an independent insurance agent in Wytheville, Virginia, and asked if James could write the coverage. Cochran told James that Vencill needed coverage in at least the sum of $100,000 for each person up to the sum of $300,000 for each accident along with $50,000 for property damage. This coverage was a prerequisite to Vencill's being awarded a contract by Pounding Mill Quarries to haul stone.

After being unsuccessful in obtaining insurance for Vencill directly with any insurance company, James, on behalf of Vencill, made application to the Virginia Automobile Insurance Plan for the placing of Vencill's application with an insurance company under the assigned risk provisions of the Plan. Thereafter, James received notice from the State that the application had been assigned to Insurance Company of North America (hereinafter referred to as "INA"). INA subsequently sent the policy of insurance, naming Vencill as the named insured, to James. Under the basic insuring agreement, the policy (NAR 07 71 34) afforded coverage in the amount of $20,000 each person, $30,000 each accident, and $5,000 property damage (20/30/5). However, an endorsement was attached to the policy which stated, in pertinent part:

"In consideration of the additional premium it is hereby understood and agreed that the limits of liability are amended to read:

(1) $25,000 each person, $50,000 each accident Bodily Injury Liability and $10,000 each accident Property Damage Liability with respects to an accident arising out of the ownership, maintenance or use of the following vehicles while used as Common Carrier within the limits of Va. . . ."

By telegram dated April 23, 1971, INA notified the State Corporation Commission: "THIS WILL CONFIRM THAT WE HAVE COVERED EFFECTIVE 4/21/71 UNDER POL. # NAR077134 FOR USE AS A COMMON CARRIER THE FLWG. ASSIGNED RISK: HERBERT CECIL VENCILL P. O. BOX 94 RIPPLEMEAD, VA. LIMITS OF COVERAGE ARE 25/50,000 B1 and 10,000 PD. AN MC11 FILING IS BEING ISSUED BY OUR OFFICE. 026 SUSAN GORMAN INS CO OF NORTH AMERICA."

The MC–11 issued [1] and countersigned by an authorized agent of INA showed that INA insured Vencill under Policy No. NAR 01 71 34, *which policy, by this endorsement, is amended* to provide coverage in at least the amounts of 25/50/1. [Emphasis supplied]. Nowhere in the certificate endorsement is there contained any territorial-limiting provision.

At any rate, James, believing that Vencill's limits of liability were 25/50/10, secured on behalf of Vencill excess coverage under a policy issued by Continental Casualty Company (hereinafter referred to as "CNA") through Atlas Underwriters Ltd. of Richmond, Virginia. An Excess Limits Policy, being Policy No. 807 06 39, insuring Vencill in the amount of $75,000/$250,000/$40,000 was issued by CNA. However, this coverage would be effective only after the limits of the underlying INA policy of 25/50/10 were exhausted. At this point, James and Vencill both thought that Vencill had $100,000/$300,000/$50,000 coverage.

Thereafter, on May 27, 1971, in Mercer County, West Virginia, a collision occurred between a truck owned by Vencill and being driven by Arthur Alley, an employee of Vencill, and an automobile driven by Melva S. Workman in which Juanita Sue Ellison was riding as a passenger. As a result of the collision, Workman and Ellison received serious personal injuries.

Both INA and CNA were notified of the accident; whereupon INA assigned to Don Lilly of John Roane, Inc., the task of adjusting the claims. Early on, and by all

1. Under the provisions of Chapter 12, Title 26, Code of Virginia, all carriers must file an MC–11 which sets forth the minimum limits of liability according to the character of the work a carrier performs. This form or other proper evidence of the required minimum limits of liability must be filed before any permit or certificate is issued to the carrier.

accounts, it was apparent that the accident was caused by the negligence of Alley,[2] and that therefore vicarious liability would be imposed on Vencill.

In the early part of the summer, 1971, both Workman and Ellison retained the services of Sidney Kwass, an attorney practicing in Bluefield, West Virginia, to represent their interests regarding their respective claims for injuries and damages.

On August 16, 1971, William Long, the claims resident representative for INA in Charleston, West Virginia, received word from INA's underwriting office that coverage was in the amount of 20/30/5. As early as September 8, 1971, there was realization on the part of INA that the claims of the two women might exceed the policy limits. In a letter to Lilly on that date, Long stated that " . . . there is a possibility the claim may exceed our limits."

On December 29, 1971, an INA inter-office memo regarding this claim was sent from Charleston to Pittsburgh which ominously stated:

"Have we placed the insured on notice of the potential excess exposure? Do you believe we should offer the policy limit in hopes to settle? As I recall this case involved serious injuries and the reduced limits could make the full policy exposure. We do not want to get into a 'bad-faith' situation here."

In a letter to Lilly dated February 10, 1972, Kwass enclosed various medical reports concerning Mrs. Workman and on her behalf demanded the sum of $17,500 in settlement of her claim. Lilly told Long of this development; whereupon Long wrote to Lilly on February 18, 1972, stating that he believed the Workman demand to be excessive and that he would rather negotiate both claims at the same time. However, Long further stated that "[i]t does appear that Mrs. Ellison has severe injuries and her claim could well run in excess of $20,000 limit per person."

In a February 29, 1972 letter to Long, Lilly outlined what had occurred at a meeting he had had with Kwass concerning settlement of the claims. At that meeting Lilly told Kwass that the INA policy limits were 20/30. Kwass was doubtful of this due to his knowing about the Virginia law on carriers being required to have minimum coverage of 25/50.[3] Lilly told Kwass that that was true but the 25/50 endorsement only applied to an accident occurring in Virginia. At any rate, Kwass asked to see the policy. Lilly advised Long that "some discussion should be made along the lines of attempting to conclude the loss [4] *based on our policy limits.*" [Emphasis supplied]. Lilly then concluded the correspondence by stating that Kwass had "indicated that it might be possible just *to settle both cases for the policy limits.*" [Emphasis supplied].

Long replied on March 3, 1972, stating that he "certainly [was] not going to furnish Mr. Kwass a copy of our policy" nor was he giving Kwass any written confirmation of the limits. Long then informed Lilly that Vencill had "excess coverage and the excess carrier is on notice. Therefore, we do not have to be concerned with a bad faith situation."

Long concluded by stating " . . . when the time comes, *I feel we should try to negotiate some savings on our limits.*"[5] [Emphasis supplied].

On March 9, 1972, Lilly again wrote Long advising him that Kwass had said that INA

2. A brake failure defense theory was abandoned early in the adjustment of this accident.

3. By letter dated July 27, 1971, Kwass had received the following from the Virginia Motor Transportation Division of the State Corporation Commission:
   "We acknowledge receipt of your letter of July 22, 1971.
   According to our records we have MC–11(D) Certificate of Insurance on file for Herbert C. Vencill, Ripplemead, Virginia, covering Insurance Company of North America Policy NAR 077134. This filing covers contract carrier operations. The minimum coverage required by this Commission for a contract carrier is $25,000 liability one person, $50,000 total liability and $1,000 property damage. The filing is effective April 21, 1971, and will be terminated April 21, 1972.

4. The term "the loss" apparently referred to both the Ellison claim and the Workman claim.

5. This statement by Long is simply beyond the pale.

would "have to give him written disclosure of our policy limits and conditions and then he will accept the policy limits and settlement of both cases. . . ." Long replied to Lilly:

"I suggest you advise Mr. Kwass that we will verify our policy limits at the time of settlement. He can therefore make any settlement contingent upon the verification of our limits. That is, when settlement is agreed upon we will furnish Mr. Kwass a letter setting forth our limits.[6]

"In your discussions with Mr. Kwass please do not make any commitment to settle for the policy limit. Simply inform him that we will need full medical and specials on the claim of Mrs. Ellison before we can evaluate her injury for settlement purposes."

Kwass thereafter instituted two civil actions in the Circuit Court of Mercer County, West Virginia, on behalf of Ellison and Workman. INA retained the services of Joseph M. Sanders, Jr., of Bluefield to represent its interests in these actions. In addition, INA notified both Vencill and Alley that the plaintiffs were demanding amounts over and above the INA coverage and that they could obtain *additional counsel to represent their interests,* if they so desired. Each declined to do so. CNA was also advised of the institution of these actions.

When Long on May 17, 1972 forwarded the INA file to Sanders, he stated in his covering letter:

"In reviewing our file, you will note this is a case of clear liability and the only question is one of value. . . ."

Long was transferred to Pittsburgh the following September. At no time during his handling of the claim had INA offered any sum to Kwass in settlement of either claim.

Gerald Laukus became the new resident representative for INA in Charleston. In his November 28, 1972 letter to Laukus, Sanders stated:

"It is my opinion that, if necessary, we should offer Mrs. Ellison the full $20,000 coverage. While she is making a good recovery she still has bad injuries; this is a clear case of negligence, and our clients are target defendants. In light of the insurance situation, that is that the excessive coverage would not commence unless Mrs. Ellison obtained a verdict over $25,-000, leaving an exposure for our clients of $5,000, there is too much danger that a jury could bring in a verdict in excess of $20,000 and *INA may be chargeable with bad faith* for not settling within the policy limits. . . . [Emphasis supplied]. Incidentally, if we do not settle within our policy limits and a verdict exceeding $25,000 would be rendered against defendants, Alley and Vencill, it could very well be that *CNA, which carries the excessive (sic) coverage, would have an action against INA for not settling within its policy limits.* Wouldn't CNA be entitled to the same protection as our insured? [Emphasis supplied].

At last, on December 1, INA gave Sanders the authority to settle the Ellison claim for $20,000 and the Workman claim for $5,000. But, undaunted, Laukus rejected his counsel's opinion regarding a bad faith claim by stating that since Vencill knew of the excess problem by letter of June 2, 1972, such knowledge would absolve INA of any such future liability.[7]

On December 2, 1972, Sanders advised Vencill by letter[8] that Kwass had made a demand to settle in the amount of $30,000 for Ellison and $10,000 on behalf of Workman.[9] He then states that he had "offered $20,000 in the Ellison case and $5,000 in the

---

6. The Court is not at all sure just exactly what it is Long means, but it sounds like a slight variation of "Catch-22."

7. It is just inconceivable to this Court that the resident representative of INA could write such a thing, thereby summarily overruling the opinion of INA's very competent lawyer.

8. CNA was an information addressee to this letter.

9. These amounts were in addition to certain advance payments INA had made to each of the women.

Workman case, less the . . . advanced payment . . ." In that letter, Sanders conceded that the case "is an extremely dangerous case to try" and that "a verdict in the range of $50,000 or more would not be a surprise." As it turned out, it wasn't. The jury returned verdicts in favor of Ellison and Workman in the sums of $75,000 and $25,000, respectively.[10]

Thereafter, Sanders filed a motion for a new trial on behalf of Vencill and Alley. However, before further steps were taken, INA instructed Sanders not to do anything further on its behalf regarding any post-trial proceedings. INA then paid the sum of $30,000 to the plaintiffs,[11] and at that point Sanders withdrew from the case. CNA declined to pay any excess amount, taking the position that it was not required to do so until the Ellison judgment was satisfied up to $25,000.[12]

Vencill, Ellison and Workman then instituted this action against INA and CNA, demanding that these insurance companies satisfy the circuit court judgments. CNA filed a cross-claim against INA, alleging if it were required to pay any sum to the plaintiffs, then INA would be liable to CNA for any such sum due to INA's "willfully, negligently and in bad faith" refusing to settle the state court actions within the limits of its coverage and further that INA refused to pay the full amount of its coverage, thought by CNA to be 25/50, as to the state court judgments. INA denied that it was guilty of any such conduct and asserted that CNA was guilty of negligence which proximately contributed to its potential liability.[13] INA and CNA then settled this action with the plaintiffs by INA contribu-

ting an additional $10,000 and CNA contributing $60,000. This Court, by order of August 20, 1974 approved such settlement without prejudicing the right of the two insurance companies in litigating the cross-claim.

## DISCUSSION

### I

■ Under the doctrine of equitable subrogation, the duty owed an excess insurer by a primary insurer to act in good faith and without negligence in the settlement of claims within the policy limits is identical to that owed an insured. *American Fidelity & Casualty Co. v. All American Bus Lines,* 190 F.2d 234 (10th Cir. 1951); *Peter v. Travelers Insurance Co.,* 375 F.Supp. 1347 (C.D. Cal.1974). That duty includes the giving of adequate consideration for the interests of the excess insurer and such duty is not diminished by reason of a contract of insurance between the insured and his excess carrier. *Peter v. Travelers Insurance Co., supra.* Thus, under this doctrine, a primary insurer may be responsible to an excess insurer for an excess verdict where the primary insurer wrongfully refuses to settle a claim within its policy limits.

■ Generally, for an insurer to be held liable in an "excess verdict" case, it must be shown that such insurer acted either negligently or in bad faith. Some courts have adopted the "bad faith" rule while others have adopted the "negligence" rule. See, *Daniels v. Horace Mann Mutual Insurance Co.,* 422 F.2d 87 (4th Cir. 1970).

In this diversity action, the Court is bound by West Virginia law[14] in determining which standard or rule to apply in de-

---

10. Regarding the Workman verdict, Laukus, in a post-trial memorandum to INA's home office, said that INA's doctor found more wrong with Workman than did Workman's doctor.

11. Ellison was paid $20,000 and Workman $10,000.

12. CNA also, of course, took the position that they owed nothing at all on the Workman judgment since it was only in the amount of $25,000.

13. INA impleaded James pursuant to Rule 14, Federal Rules of Civil Procedure. The third-party claim, however, was severed from the adjudication of the cross-claim.

14. The Court has determined that this issue is to be decided under West Virginia law, while the amount of coverage issue, infra, is to be decided under Virginia law.

ciding the ultimate issue. *Erie. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). However, this state's highest court has not "definitely declared whether both or which, if only one, of these factors—negligence or bad faith—must be shown." *Daniels v. Horace Mann Mutual Insurance Co., supra,* at 88.

Although the plaintiff in *Speicher v. State Farm Mutual Auto. Ins. Co.,* 151 W.Va. 292, 151 S.E.2d 684 (1966), predicated his "excess verdict" cause of action on defendant's being guilty of bad faith in not settling the claim of David Morgan in Morgan's suit for personal injuries against Speicher in state court, the Supreme Court of Appeals of West Virginia did not adopt either rule. Rather, it held as a matter of law that State Farm was not guilty of either bad faith or negligence in conducting settlement negotiations with Morgan.

Thus, while ordinarily we would be called upon to make an informed prediction as to which rule West Virginia's highest court would adopt, *United States v. Ritter,* 416 F.Supp. 777 (S.D.W.Va.1977), we find it unnecessary to do so.

This Court agrees with Judge Bryan, writing for the court in *Daniels, supra,* as to his analysis of the relative positions of the insurer vis-a-vis its insured (or, as is the case here, the excess insurer):

"In short, the demand of care and good faith arises from the dual and delicate position of the insurer. In its hands at one and the same time are its own and the interests of the insured. If not technically, certainly practically, a trusteeship is posed. Selfishness will not be tolerated, yet the insurer is not to be held for a sincere mistake of judgment.

"The District Judge looked, too, at *American Casualty Co. of Reading, Pa. v. Howard,* 187 F.2d 322, 329 (4th Cir. 1951). Although it involved the law of South Carolina, Judge Dobie laid down a test which seems to be acceptable as a general proposition: that if the insurer acted 'reasonably, in good faith and without negligence in refusing proffered settle-ments' it met its obligations to the insured. This pronouncement is our test for decision presently. It provides an understandable and workable formula. Cf. *Gaskill v. Preferred Risk Mut. Ins. Co.,* 251 F.Supp. 66, 68 (D.C.Md.1966) *aff'd per curiam* 371 F.2d 792 (4 Cir.)." 422 F.2d at 89.

Additionally, it was held in *Peter v. Travelers Ins. Co., supra* at 1349, that "the test is whether a prudent insurer without policy limits would have accepted the settlement offer. The Court need not find that the available offer should have been accepted."

■ The evidence before the Court makes it abundantly clear that INA acted neither reasonably nor in good faith, nor without negligence, in attempting to settle the claims. Indeed, it did nothing at all respecting offering any sum in settlement of the claims until the last minute. It is the affirmative duty of an insurer to pursue serious negotiations, particularly in the case with which INA was confronted. *Daniels v. Horace Mann Ins. Co., supra; Abernethy v. Utica Mut. Ins. Co.,* 373 F.2d 565 (4th Cir. 1967).

Everyone connected with the Ellison and Workman claims—Long and Laukus included—knew the situation to be one of absolute liability with a strong possibility that a jury verdict might well be in excess of the coverage afforded, particularly respecting the Ellison suit, if not also Workman. Moreover, the people closest to the case—Lilly and Sanders—warned INA that this might be exposing itself to a "bad faith" claim if the cases were not settled within the policy limits. But for some reason or other INA took the unwavering position that no such claims could be maintained against it because Vencill had excess insurance coverage. However, that fact is of little moment. See, *Daniels v. Horace Mann, supra* at 90. In addition, during the period when settlement could have been made, INA gave Vencill little consideration respecting his potential exposure. INA took the position that Vencill's coverage was 20/30 and not 25/50. Thus, it knew

that Vencill's personal expense could have been as much as $20,000. Yet, INA did not consult with Vencill concerning settlement opportunities nor was the case otherwise discussed with him. These are important factors in determining this issue on the cross-claim because if the insured is adequately protected by his primary insurer, the excess insurer is *ipso facto* afforded the same protection. See, *Riske v. Truck Ins. Exchange,* 490 F.2d 1079 (8th Cir. 1974).

*Crisci v. Security Ins. Co.,* 66 Cal.2d 425, 58 Cal.Rptr. 13, 426 P.2d 173 (1967), holds that there is an implied covenant of good faith in an insurance contract that both parties to that contract will do nothing to harm or injure the other's rights under the policy and such covenant requires that the insurer settle in an appropriate case. The case from which the instant litigation flows was such a case.

█ Finally, INA contends that CNA was guilty of negligence which proximately contributed to any damages suffered by CNA. This defense is without merit. CNA had no contractual duty with Vencill to defend him. In addition, CNA had no duty to pay any sum until Ellison's judgment has been partially satisfied in the sum of $25,-000. The gap was never satisfied as to either judgment.

As is stated by the court in *Peter v. Travelers Ins. Co., supra,* at pp. 1350–51:

"While the interests of the primary insurer are, for the most part, unaffected by the existence of excess coverage, the interests of the excess carrier are very much affected by the actions of the primary. If the primary carrier undertakes the representation of the insured, then it has the sole right to negotiate settlements. If the primary carrier is relieved of its duty to accept reasonable offers by the existence of excess insurance, it would put an additional financial liability on the excess carrier which would be reflected in increased premiums. It would also have the effect of reducing the incentive of a primary insurer to settle when the settlement offer is near or over

its policy limits. This is contrary to the interests of the public and the insured in obtaining prompt and just settlement of claims. See generally, Bloom, Recovery Against Primary Insurer by Excess Carrier for Bad Faith or Negligent Failure to Settle, 36 Ins. Counsel J. 235 (1969)."

## II

Deciding the issue as to what coverage was afforded Vencill under the INA policy is perhaps an exercise in academics, inasmuch as the Court does hereinafter conclude that INA did not act reasonably, in good faith and without negligence in the handling of the Ellison and Workman claims to the detriment of Vencill and CNA.

█ In any event, an examination of the policy, complete with the endorsements thereto, leads the Court to no other conclusion than at the time of the accident Vencill's coverage was 25/50. The basic policy established coverage in the sums of 20/30. An endorsement to that policy was issued on the same day the policy was issued which provided that Vencill's motor vehicles, save one, were covered in the sums of 25/50 "while used as Common Carrier within the limits of Va. . . ." But, and as previously stated, by operation of law, the MC–11 endorsement issued by INA amended the policy itself so that the minimum coverage afforded Vencill was in the sums of 25/50. It is important to note that the MC–11 contained no limiting language regarding territorial restriction or otherwise. The Court believes that the MC–11 endorsement when read in its entirety creates no ambiguity as to the policy as a whole. But even if the MC–11 did create an ambiguity, such would be resolved against INA. See, 13A Appleman, *Ins. Law & Practice,* § 7538, p. 13.

█ INA argues that the MC–11 coverage only applies while a covered vehicle operates in Virginia, notwithstanding the absence of any language to that effect in the MC–11 provisions. In other words, INA submits that when the vehicle crossed into West Virginia, the 25/50 coverage created

by the MC–11 was automatically vacated and the 20/30 coverage applied. This argument, however, is not supported by the record. Indeed, one of INA's senior underwriters, Jack McCall, testified as follows:

"Q. Are you familiar with any contract that INA writes, or any endorsement that is attached to any contract that INA writes, that provides for a reduction of limits as a vehicle crosses a state line? A. I have never used one where the limits vary. No, sir." [McCall dep. pp. 20–21]

INA has not cited, nor has the Court been able to find any case which supports this contention by INA.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter of and the parties to this action pursuant to 28 U.S.C. § 1332.

2. Insurance Company of North America, as the primary insurer of Herbert Vencill, owed to Continental Casualty Company, the excess insurer of Vencill, the duty to act reasonably, in good faith and without negligence in the settlement of the claims of Juanita Sue Ellison and Melva S. Workman. By reason of its conduct, hereinbefore described, Insurance Company of North America breached said duty, which proximately caused Continental Casualty Company to suffer damages in the sum of $60,000.

3. Continental Casualty Company, as the excess insurer of Herbert Vencill, owed no duty to Insurance Company of North America, as his primary insurer, to either defend the state court actions brought by Juanita Sue Ellison and Melva S. Workman or to enter into any settlement negotiations with those state court plaintiffs.

4. The MC–11 endorsement issued by Insurance Company of North America amended Policy No. NAR 077134 to afford Herbert Vencill personal injury liability coverage in the sum of $25,000 to each person up to the sum of $50,000 for each accident. In addition, said policy afforded coverage relating to property damage in the sum of $10,000.

5. Said policy of insurance issued to Herbert Vencill by Insurance Company of North America, affording liability coverage to Vencill in the sums set forth in the preceding paragraph, was in full force and effect on May 27, 1971, the date of the accident in which Juanita Sue Ellison and Melva S. Workman were injured.

6. Continental Casualty Company is entitled to recover from Insurance Company of North America the sum of $60,000, with interest as provided by law from August 20, 1974.

Judgment will be in favor of Continental Casualty Company and against Insurance Company of North America in accordance with this Memorandum Opinion.